**Nos. 21-55118, 21-55157**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Christopher Garnier & Kimberly Garnier,

*Plaintiffs–Appellees–Cross-Appellants,*

v.

Michele O'Connor-Ratcliff & T.J. Zane,

*Defendants–Appellants–Cross-Appellees.*

On appeal from the United States District Court for the
Southern District of California — No. 3:17-CV-02215-BEN-JLB (Benitez, R.)

On remand from the Supreme Court of the United States

**BRIEF OF AMICI CURIAE THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF PLAINTIFFS–APPELLEES–CROSS-APPELLANTS**

David Greene
Sophia Cope
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

Katherine Fallow
Stephanie Krent
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that amici curiae the Knight First Amendment Institute at Columbia University and Electronic Frontier Foundation have no parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

/s/ *Katherine Fallow*
Katherine Fallow

i

## Table of Contents

Table of Authorities ................................................................................................... iii

Interest of Amici Curiae ............................................................................................ 1

Introduction ................................................................................................................ 2

Argument ................................................................................................................... 4

    I.     State action is present in social media blocking cases when public officials rely on their general authority to speak on behalf of the government. .............................................................................................. 4

          A.     Officials typically have authority to speak on behalf of the government when they are high-ranking or have responsibility over the subject matters being discussed .................. 4

          B.     Officials exercise their authority to speak on behalf of the government when they write social media posts or operate their accounts in furtherance of their job duties ............................ 7

    II.    The state action test is satisfied here. ..................................................... 11

Conclusion ............................................................................................................... 13

Certificate of Compliance ....................................................................................... 14

## Table of Authorities

### Cases

*Aydelotte v. Town of Skykomish*, 757 F. App'x 582 (9th Cir. 2018) ........................ 5

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) .................................................. 2

*Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022) .................. 2, 6, 11, 12

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226
    (2d Cir. 2019) ................................................................................................ 2, 8

*Lindke v. Freed*, 601 U.S. 187 (2024) ............................................................. passim

*McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986) ................................................. 5

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995) ........................................................ 6

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ............................................... 3

### Statutes

Cal. Educ. Code § 35172(c) ..................................................................................... 11

### Other Authorities

Alexandria Ocasio-Cortez (@AOC), X (May 19, 2023, 4:07 PM),
    https://perma.cc/8ZA4-8FAN ............................................................................ 10

*Bd. Member Elec. Commc'ns*, BB 9012(a), Poway Unified Sch. Dist.
    (adopted Aug. 9, 2018), https://perma.cc/VH5M-MLNN ................................ 12

Chief Art Acevedo (@ArtAcevedo), X (Sept. 15, 2018, 8:04 PM),
    https://perma.cc/PV54-53XW ........................................................................... 10

G.T. Bynum (@gtbynum), X (Feb. 27, 2024, 7:19 AM),
    https://perma.cc/E3AR-L8Q9 .............................................................................. 9

Kamala Harris (@KamalaHarris), X (May 16, 2024, 11:48 AM),
    https://perma.cc/H848-K4TM .............................................................................. 9

Katie Hobbs (@katiehobbs), X (May 3, 2024, 4:06 PM),
    https://perma.cc/WX87-TEGZ ............................................................................... 9

*Pub. Statements*, BB 9010(a), Poway Unified Sch. Dist. (adopted
    Aug. 9, 2018), https://perma.cc/9FNC-FGWY ................................................. 12

*Role of the Bd.*, BB 9000(a), Poway Unified Sch. Dist. (adopted Aug.
    9, 2018), https://perma.cc/A572-XD2M............................................................ 11

Sarah Huckabee Sanders (@SarahHuckabee), X (Apr. 11, 2023, 9:41
    PM), https://perma.cc/NKF5-EMJY.................................................................... 9

## Interest of Amici Curiae[1]

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that defends the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute is committed to protecting the integrity and vitality of online public forums in which citizens communicate with each other and government representatives about matters of public concern, and it has represented plaintiffs in social media blocking cases involving government actors and entities.

Recognizing the internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for over 30 years, worked on behalf of more than 30,000 dues-paying members to protect the rights of users to transmit and receive information online. EFF has written on the issues presented in this appeal, has filed amicus briefs in similar cases, and has represented plaintiffs in social media blocking cases involving government accounts.

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

## Introduction

The Supreme Court's decision in *Lindke v. Freed* recognizes that public officials are bound by the First Amendment when they operate social media accounts in their official capacities. *Lindke v. Freed*, 601 U.S. 187, 191 (2024). Its decision confirms what a growing chorus of courts have held over the last several years: government-operated social media accounts that allow members of the public to post comments in the accounts' comment threads are digital-age public squares and must remain free from government censorship. *See, e.g.*, *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (mem.) (2021); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019); *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158 (9th Cir. 2022), *vacated sub nom. O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024).

In *Lindke*, the Supreme Court held that a public official's use of social media constitutes state action—and is therefore subject to First Amendment scrutiny—if the official "(1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Lindke*, 601 U.S. at 191. Amici are free speech organizations that submit this brief to assist the Court in interpreting the state action test in light of the guideposts set out by the Supreme Court.

In light of the vital importance of government-operated social media accounts to democratic engagement and political accountability, courts must apply this test in a manner that prevents the evasion of constitutional responsibilities. Social media platforms are indispensable avenues for petitioning the government and for the exchange of core political speech. *See Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017). But the promise of social media is threatened when public officials evade their First Amendment obligations by blocking critics from nominally personal social media accounts that they in fact use to further their official duties. Careful application of the state action test will play a crucial role in ensuring that digital public forums live up to their promise as sites of open public communication and political engagement.

This brief makes two points about the application of the Supreme Court's decision. First, in addressing the "authority" prong of the state action test, the central question is whether, through law or custom, the public official has the general authority to speak on behalf of the government, not whether there is authorization to speak on social media specifically. Second, in addressing the "exercise" prong of the test, courts should consider the nature of the official's account, the nature of the posts relevant to the plaintiff's claim, and, where appropriate, additional features of the account.

Although this Court initially applied a different state action test, the record in this case amply supports the conclusion that the Supreme Court's state action test is satisfied here.

## Argument

**I.  State action is present in social media blocking cases when public officials rely on their general authority to speak on behalf of the government.**

In *Lindke*, the Supreme Court confirmed that when government officials speak in their official capacities online, their speech is "attributable to the state" and they are bound by the First Amendment. *Lindke*, 601 U.S. at 191, 197–98. To separate protected private speech from state action, courts must take a "close look" at both the speech and the speaker, *id.* at 197, to answer two questions: Did the official have authority to speak on behalf of the government? And if so, was she actually exercising that authority when speaking on social media? *Id.* at 198. Answering these questions requires courts to focus on "substance, not labels." *Id.* at 197.

**A.  Officials typically have authority to speak on behalf of the government when they are high-ranking or have responsibility over the subject matters being discussed.**

Because officials cannot "conjure the power of the State through [their] own efforts," *Lindke*, 601 U.S. at 199, the first step of the state action analysis is meant to determine whether they have authority to speak officially. Three guideposts for

4

courts addressing the "authority" prong of the state action test are evident from the Supreme Court's opinion.

First, an official's authority can be established through written laws, regulations, or ordinances—explicitly, by authorizing an official to speak on behalf of the government, or implicitly, by conferring on the official a general power to set policy or make decisions that necessarily encompasses the authority to speak on the government's behalf. *Id.* at 200–01. For example, as the Supreme Court explained, "state law might grant a high-ranking official like the director of the state department of transportation broad responsibility for the state highway system that, in context, includes authority to make official announcements on that subject." *Id.*

Second, the authority to speak on the government's behalf may be established by "custom and usage," which "encompass 'persistent practices of state officials' that are 'so permanent and well settled' that they carry 'the force of law.'" *Id.* at 200 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). And longstanding precedent is clear that a "custom" may exist even if it is not age-old. *See, e.g.*, *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) (stating that a policy or custom can be inferred from repeated and prevalent constitutional violations during a single event); *Aydelotte v. Town of Skykomish*, 757 F. App'x 582, 585 & n.2 (9th Cir. 2018) (holding in a municipal liability case that multiple incidents of unconstitutional conduct within a three-year period could establish "a

5

longstanding policy or custom of [retaliation]"). To ascertain custom in any given case, courts should consider all relevant evidence, including information about the way an official executes her job duties, employment agreements or job descriptions, and even evidence about her predecessors' practices. *Cf. Navarro v. Block*, 72 F.3d 712, 715 (9th Cir. 1995) (holding in municipal liability case that emergency dispatcher's testimony about current practices of Sheriff's Department in classifying 911 calls could establish custom).

Third, the authority that matters at this step of the inquiry is the authority to speak on behalf of the government generally, not on social media in particular. If an official has the general power to speak on behalf of the government, it should not be necessary for the court to determine that the official has authority to speak via any specific medium. *See Lindke*, 601 U.S. at 200.

Given these guideposts, courts should have little trouble concluding that high-ranking officials, like Defendants in this case, possess the requisite authority. Many elected officials, like presidents, governors, mayors, and legislators, have broad authority to speak on government policies and activities. For example, as this Court observed in its earlier opinion, legislators' duties "extend beyond 'participating in debates and voting,'" and include acts that are in service of their broader obligation "to serve and respond to their constituents." *Garnier*, 41 F.4th at 1173 (cleaned up).

6

Heads of government agencies or entities are also generally empowered to speak on matters broadly relevant to those agencies. *Lindke*, 601 U.S. at 199–201.

The closer questions will arise for lower-ranking officials. In those cases, a court's inquiry is likely to focus on custom rather than written laws. As discussed above, evidence of the official's own practices, and possibly the practices of her predecessors, *see id.* at 200, will be key in establishing the extent of her authority. For a lower-ranking official in particular, it will matter whether the relevant speech relates to subjects within her "bailiwick." *Id.* at 199.

Of course, the fact that high-ranking officials generally have authority to speak on behalf of the government does not mean that they *always* speak for the government, or that their First Amendment rights must be sacrificed in favor of the public's. The second step of the state action inquiry ensures that officials must actually exercise their authority by using social media as a tool of governance before they can be held liable for First Amendment violations.

**B.  Officials exercise their authority to speak on behalf of the government when they write social media posts or operate their accounts in furtherance of their job duties.**

The "exercise" prong of the state action test requires courts to consider the nature of the official's account, the nature of the posts relevant to the plaintiff's claim, and the official's operation of the account.

7

In some cases—like when the government itself owns the account—the presence of state action will be obvious. *Lindke*, 601 U.S. at 202. But where a social media account is nominally personal or campaign-related, courts must engage in a "fact-specific undertaking" to determine whether the official was speaking in furtherance of her job duties. *Id.* at 203. The scope of this undertaking depends on the plaintiff's allegations. When a plaintiff complains about being banned or blocked, the court should consider all posts the plaintiff would have wished to see or comment on; when a plaintiff complains about particular comments being censored, the court should consider the posts from which the plaintiff's comments were suppressed. *Id*. at 204.

To begin, the content and function of the relevant posts are the "most important considerations," and may be sufficient to demonstrate state action on their own. *Id.* at 203. For example, when then-President Trump used his nominally personal account on Twitter (now "X") to announce, for the first time, that he had fired one chief of staff and hired a new one, he was speaking in furtherance of his official duties as president. *See Knight First Amend. Inst.*, 928 F.3d at 232, 235–36. And many officials use their social media accounts to make announcements about

the government's emergency preparedness or response to local emergencies.[2] That they use their accounts in this way is "significant evidence" they speak as officials responsible for the safety of local residents, not merely as concerned neighbors. *See Lindke*, 601 U.S. at 202.

The inverse is also true: there are some situations where the relevant posts are plainly insufficient to demonstrate the presence of state action. For example, Vice President Kamala Harris has used her nominally personal account to post anecdotes about her high school graduation ceremony.[3] Officials also do not represent the government when they author obviously campaign-related posts. *See Lindke*, 601 U.S. at 203 (discussing promoting reelection as private speech). For example, when Arizona Governor Katie Hobbs posted from her nominally personal account to remind Arizonans that "[c]ome November," they "will have the opportunity to defeat anti-choice Republican legislators," she was speaking as a partisan politician, not as the governor of a swing state.[4]

---

[2] *See, e.g.*, Sarah Huckabee Sanders (@SarahHuckabee), X (Apr. 11, 2023, 9:41 PM), https://perma.cc/NKF5-EMJY; G.T. Bynum (@gtbynum), X (Feb. 27, 2024, 7:19 AM), https://perma.cc/E3AR-L8Q9.

[3] Kamala Harris (@KamalaHarris), X (May 16, 2024, 11:48 AM), https://perma.cc/H848-K4TM.

[4] Katie Hobbs (@katiehobbs), X (May 3, 2024, 4:06 PM), https://perma.cc/WX87-TEGZ.

9

In many cases, the content and function of the relevant posts will not be sufficient to show whether the official is speaking in a personal capacity or an official one. *See Lindke*, 601 U.S. at 203. Public officials routinely post about their jobs in ways that are consistent with both official and private speech. It is not always apparent whether they are speaking on behalf of their offices or are using their accounts as tools to highlight campaign issues or personal political opinions.[5] The *Lindke* decision implicitly recognized this problem, noting that public officials who are authorized to speak to the public run greater risk of liability for censorship if they block commenters from an account that mixes official and personal posts. *Id*. at 204.

When the relevant posts are not easy to classify definitively, courts should consider "additional factors" about the nominally personal or campaign-related account, including its appearance, the resources used to operate the account, and the existence of any clear disclaimers.[6] *Lindke*, 601 U.S. at 198, 203. When undertaking this "fact-intensive inquiry," *id.* at 197, courts should not reflexively tilt toward an

---

[5] *See, e.g.*, Alexandria Ocasio-Cortez (@AOC), X (May 19, 2023, 4:07 PM), https://perma.cc/8ZA4-8FAN; Chief Art Acevedo (@ArtAcevedo), X (Sept. 15, 2018, 8:04 PM), https://perma.cc/PV54-53XW.

[6] Disclaimers "give speech the benefit of clear context" and therefore create a "heavy . . . presumption" that speech is private. *Lindke*, 601 U.S. at 202. But the use of a disclaimer on its own "cannot insulate government business from scrutiny." *See id.* at 202 n.2. If it could, any official could create an end-run around the First Amendment by appending a disclaimer to her account and then using the account as a tool of governance anyway.

official's post-hoc characterization of her account as personal or campaign-related. They must instead respect the careful balance the Supreme Court struck between the private speech rights of the official operating the account and the rights of members of the public to see and participate in digital public forums by applying these factors fairly and objectively.

## II. The state action test is satisfied here.

Although this Court previously applied a different state action test than the one prescribed by the Supreme Court in *Lindke*, the outcome of this case should remain the same. The facts in the record satisfy both prongs of the Supreme Court's state action test.

On the first prong, both written law and custom demonstrate Defendants' authority to speak on behalf of the government. As this Court previously noted, *see Garnier*, 41 F.4th at 1171–72, California law and the Board of Trustees' bylaws establish that school board members have the authority and the responsibility to speak on behalf of the government about the district's educational programs and schools. Cal. Educ. Code § 35172(c); *Role of the Bd.*, BB 9000(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018), https://perma.cc/A572-XD2M (requiring the Board to "ensure that the district is responsive to the values, beliefs, and priorities of the community" and "involve[] the community" in decisionmaking). The Board's bylaws contemplate that members will use social media to "communicate . . . within

11

the district and with members of the public." *Bd. Member Elec. Commc'ns*, BB 9012(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018), https://perma.cc/VH5M-MLNN. In practice, school board members regularly communicate with the public as part of their job duties. *See, e.g.*, 7-ER-1596 (Zane Testimony) (stating that it is "part of the job" to listen to and address constituents' concerns); 7-ER-1646 (O'Connor-Ratcliff Testimony) (similar).[7]

On the second prong, the content of Defendants' social media pages demonstrates that they were consistently exercising their authority to speak on behalf of the government. As this Court previously noted, the Defendants' social media posts were "overwhelmingly geared toward providing information to the public about the PUSD Board's official activities and soliciting input from the public on policy issues relevant to Board decisions." *Garnier*, 41 F.4th at 1171 (cleaned up). And the appearance of Defendants' social media pages further reinforces this conclusion because, among other factors, Defendants identified themselves as "government official[s]," prominently listed their official titles, and included no disclaimers. *Id.*

---

[7] At the very least, it is clear that Defendant O'Connor-Ratcliff had the authority on behalf of the government as president of the Board of Trustees. *See Pub. Statements*, BB 9010(a), Poway Unified Sch. Dist. (adopted Aug. 9, 2018), https://perma.cc/9FNC-FGWY.

Accordingly, this Court should again hold that Defendants exercised state action when using their social media pages as public forums to carry out their official duties.

## Conclusion

For the foregoing reasons, this Court should again affirm the district court judgment.

August 1, 2024

David Greene
Sophia Cope
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org

Respectfully submitted,

/s/ *Katherine Fallow*

Katherine Fallow
Stephanie Krent
Knight First Amendment Institute at
   Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
katie.fallow@knightcolumbia.org

*Counsel for Amici Curiae*

13

**Certificate of Compliance**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that this brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it is 2,790 words. I further certify that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

August 1, 2024 /s/ *Katherine Fallow*
Katherine Fallow

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 21-55118, 21-55157

I am the attorney or self-represented party.

**This brief contains** 2,790 **words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Katherine Fallow    **Date** August 1, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*